KINSEL, RESPONDENT, v. NORTH BUTTE MINING CO.,
APPELLANT.

(No. 3,053.)

(Submitted December 16, 1911.  Decided January 11, 1912.)

[120 Pac. 797.]

*Personal Injuries—Master and Servant—Mines—Safe Place to
Work—Fellow-servants—Vice-principal — Custom — Instruc-
tions—Evidence—Pleadings.*

Master and Servant—Personal Injuries—Pleading—Construction.
  1.  A complaint alleging that defendant ordered plaintiff, its ser-
  vant, to work in a dangerous portion of its mine, where there was
  much loose overhanging rock, and which was negligently and in-
  sufficiently timbered, in that the last set of timbers had been placed
  in a permanent position, and two long stringers had been placed
  above them, on which a large amount of rock and dirt rested, charges
  that the stringers were placed in a negligent manner, and that a
  large amount of rock and dirt was negligently allowed to rest
  thereon, but does not charge negligence in failing to lace, or breast-
  block, or angle-brace the timbers.

Same.
  2.  A complaint by an injured miner, alleging that he was required
  by defendant to work in a dangerous place, which was unsafe
  because of loose hanging rock, and because of negligent and insuffi-
  cient timber, in that the last set of timbers had been placed in a
  permanent position, and over it long stringers had been negligently
  placed, included negligence in employing a defective method of work.

Same—Evidence.
  3.  In an action by a miner, injured by the collapse of timbers,
  evidence *held* to make out a *prima facie* case of negligence on the
  part of the master.

Same—Questions for Jury.
  4.  In an action by a miner, injured by the collapse of timbers,
  evidence *held* to raise a question for the jury whether he knew and
  appreciated the peril of his position, when he went forward to
  inspect the work.

Same—Safe Place to Work—Notice to Master.
  5.  Where a master in the discharge of his duty in furnishing the
  servants with a reasonably safe place to work furnished an appli-
  ance to support the roof of a mine, the master is chargeable with
  notice of any defects of the appliance, regardless of actual notice.

Same—Injuries to Fellow-servant.
  6.  Where the negligence of a fellow-servant is relied upon, the
  injured servant must declare upon the statute, Revised Codes, section
  5248, and cannot recover in a common-law action.

Same—Safe Place to Work—Rendering a Place Safe.
  7.  Where a miner was engaged in timbering a mine to render it
  safe for others, and the timbers placed therein during his absence

were negligently fixed so that they collapsed and injured him, the master was liable, although the miner was engaged in making the place safe, if the defective conditions surrounding the place in which the miner worked were the proximate result of a negligent plan of work adopted by the master.

Same—Vice-principal.

8.   Where a shift boss of a mine superintended the timbering, he was the vice-principal of the master, and his negligence was negligence of the master, and hence, a servant having been injured by the collapse of timbering, evidence of the duties of the shift boss was admissible to show that he was a vice-principal.

Appeal and Error—Review—Harmless Error.

9.   As counsel, in addressing the jury, may found any reasonable argument upon the allegations of defendant's answer, the introduction of the answer in evidence was harmless, if erroneous.

Master and Servant—Personal Injuries—Instructions.

10.   Where the shift boss of a mine had charge of the timbering, an instruction that it is the primary duty of the master to furnish his servants with a safe place to work, and that this duty cannot be so delegated that the master will escape liability, the servant to whom it is delegated being a vice-principal for whose negligent acts the master is liable, is applicable to the evidence.

Same.

11.   In an action by a miner, injured by the collapse of timbers, where there was evidence that the place in which he was injured was finished for the time being, an instruction that where the master has created a place for work for his servants, and such place is permanent, the master owes the servant a duty to use ordinary care, so that the place may remain reasonably safe, was properly given.

Same.

12.   Where a miner was injured by the collapse of the timbers, and there was evidence that the work was done in the usual and customary way of skillful and prudent miners, the refusal of an instruction that if the place where plaintiff was injured had been timbered in the usual way, and according to the usual custom employed by reasonably prudent and skillful persons engaged in mining, then there was no negligence in the timbering of the same, was improperly refused.

Same—Injuries to Servant—Safe Place to Work—Custom.

13.   A master cannot escape liability for the injuries of his servant from a defective place of work or appliance, by showing that he has followed the usual custom of masters in furnishing places of work and appliances, but must show that degree of care which is commonly and usually exercised by reasonably careful persons under like circumstances.

*Appeal from District Court, Silver Bow County; Jeremiah J. Lynch, Judge.*

ACTION by Forrest S. Kinsel against the North Butte Mining Company.   From a judgment for plaintiff and an order denying it a new trial, defendant appeals.   Reversed and remanded.

*Messrs. C. F. Kelley, L. O. Evans, W. B. Rodgers*, and *D. Gay Stivers*, for Appellant, submitted a brief; *Mr. Rodgers* argued the cause orally.

The motion for nonsuit should have been granted: (a) For the reason that the plaintiff did not show any negligence on the part of the defendant in any of the respects complained of in his complaint. If any negligence at all was shown, which we deny, it was in respect to matters not alleged in the complaint of plaintiff, and proof of them did not tend in the remotest degree to establish the acts of negligence alleged in the complaint, and was so at variance with the alleged negligent acts as to amount to a failure of proof. (*Forsell* v. *Pittsburg etc. Copper Co.*, 38 Mont. 403, 100 Pac. 218.)

(b) Because the sole purpose of plaintiff's work having been to make a dangerous place safe, when he undertook to create a place of work, and to work in a place where the conditions were constantly changing and being changed by his own labor and that of his fellow-servants, he assumed all the risks and dangers of the work. (*Allen* v. *Bear Creek Coal Co.*, 43 Mont. 269, 115 Pac. 678; *Thurman* v. *Pittsburg etc. Copper Co.*, 41 Mont. 141, 108 Pac. 588; *Shaw* v. *New Year Gold Mines Co.*, 31 Mont. 138, 77 Pac. 515; *Petaja* v. *Aurora I. M. Co.*, 106 Mich. 463, 58 Am. St. Rep. 505, 64 N. W. 335, 66 N. W. 951, 32 L. R. A. 437; *Indiana etc. Coal Co.* v. *Batey*, 34 Ind. App. 16, 71 N. E. 191; *City of Greeley* v. *Foster*, 32 Colo. 292, 75 Pac. 354; *Oleson* v. *Maple Grove Coal Co.*, 115 Iowa, 74, 87 N. W. 736; *Kellyville Coal Co.* v. *Bruzas*, 223 Ill. 595, 79 N. E. 311; *Mielke* v. *Chicago etc. R. R. Co.*, 103 Wis. 1, 74 Am. St. Rep. 836, 79 N. W. 22; *Jennings* v. *Engle*, 35 Ind. App. 153, 73 N. E. 947; *Maloney* v. *Florence etc. R. R. Co.*, 39 Colo. 384, 121 Am. St. Rep. 182, 89 Pac. 649, 12 Ann. Cas. 621, 19 L. R. A., n. s., 348.)

(c) For the reason that it clearly appears from the testimony that the plaintiff, even though it should be admitted he was working in a place which the defendant was required to furnish him and make safe, assumed all risks of the accident. The law in reference to the assumption of extraordinary risks by a ser-

vant does not require that he must realize that if he places himself in a certain position he will receive a certain injury. Such realization need not amount to an assurance of injury. All the law or the decisions of this court require is, that he either realizes that there is, or may be, danger growing out of the conditions that exist, or that as a reasonable person, knowing what he knows and seeing what he sees, he ought to realize that existing conditions may result in danger to him exceeding what he would otherwise be subjected to. (*Anderson* v. *Northern Pac. Ry. Co.*, 34 Mont. 181, 85 Pac. 884; *Stewart* v. *Pittsburg etc. Copper Co.*, 42 Mont. 200, 111 Pac. 725; *McCabe* v. *Montana Cent. Ry. Co.*, 30 Mont. 323, 76 Pac. 701; *Coulter* v. *Union Laundry Co.*, 34 Mont. 590, 87 Pac. 973; *Gregory* v. *Chicago etc. R. R. Co.*, 42 Mont. 551, 113 Pac. 1126; *Fotheringill* v. *Washoe Copper Co.*, 43 Mont. 485, 117 Pac. 86; *Crown Coal & Tow Co.* v. *Koenig,* 119 Ill. App. 192; Bailey on Personal Injuries, sec. 459.)

Before the plaintiff may recover, he must allege and prove that he did not know, or in the exercise of ordinary prudence ought not to have known, of the particular defects complained of. See the following: Wood on Master and Servant, par. 414; *Schroder* v. *Montana Iron Works,* 38 Mont. 474, 100 Pac. 619; *Dixon* v. *Western Union Tel. Co.,* 68 Fed. 630; *Malone* v. *Hawley,* 46 Cal. 409; *Fortin* v. *Manville Co.,* 128 Fed. 642; *Brainard* v. *Van Dyke,* 71 Vt. 359, 45 Atl. 758; *Dalton* v. *Rhode Island Co.,* 25 R. I. 574, 57 Atl. 383; *Buzzell* v. *Laconia Mfg. Co.,* 48 Me. 113, 77 Am. Dec. 212; *Willie* v. *East Tennessee Coal Co.,* 27 Ky. Law Rep. 335, 84 S. W. 1166; *Mellott* v. *Louisville & N. R. R. Co.,* 101 Ky. 212, 40 S. W. 696; *Bogenschutz* v. *Smith,* 84 Ky. 330, 1 S. W. 578; *Brazil Block Coal Co.* v. *Young,* 117 Ind. 520, 20 N. E. 423; *Peerless Stone Co.* v. *Wray,* 143 Ind. 574, 42 N. E. 927.

(d) For the reason that he was guilty of contributory negligence, and is therefore not entitled to recover. (*Cummings* v. *Helena etc. R. Co.,* 26 Mont. 449, 68 Pac. 852.)

(e) For the reasons that there was no proof of any negligence upon the part of the defendant corporation, and that if

any negligent act had been established, it was solely the negligence of servants of the defendant, and was therefore at variance with the complaint, which charges only primary negligence upon the part of the defendant; and also because under the allegations of the complaint any action or neglect of the shift bosses, or either of them, would be negligence of plaintiff's fellow-servants; and the complaint in this case counted only upon the primary negligence of the defendant corporation. Before the plaintiff could recover on account of any negligence of the shift boss or bosses of the defendant, it was necessary that he should plead such negligence in order to obtain the benefits of said section 5248, Revised Codes. (*Kelly* v. *Northern Pacific R. R. Co.*, 35 Mont. 243, 79 Pac. 582; *Thurman* v. *Pittsburg etc. Copper Co.*, 41 Mont. 150, 108 Pac. 588.) The shift bosses must, therefore, under a complaint such as this, counting upon the common law and not upon the statute, be treated and considered as fellow-servants with the plaintiff. (*Thurman* v. *Pittsburg etc. Copper Co., supra;* see, also, *Allen* v. *Bell*, 32 Mont. 69, 79 Pac. 582.)

We submit that so long as the defendant established that it used the same methods and the same means in timbering the stope in question that were used by all other mine operators for timbering like places, no charge of negligence could be imputed to it in this regard. (*Gregory* v. *C. M. & St. P. Ry. Co., supra; Cummings* v. *Reins Copper Co.*, 40 Mont. 599, 107 Pac. 904; *Kehler* v. *Schwenk*, 144 Pa. 348, 27 Am. St. Rep. 933, 22 Atl. 910, 13 L. R. A. 374.) In *Bohn* v. *Chicago etc. R. Co.*, 106 Mo. 429, 17 S. W. 580, it was said: "No inference of negligence can arise from evidence which shows that the implement was used as it is ordinarily used for like purposes by persons engaged in the same kind of business." In *King* v. *Ford River Lumber Co.*, 93 Mich. 172, 53 N. W. 10, the supreme court of Michigan said: "It is sufficient if the machinery is of the kind in general use." (See, also, *Davis* v. *Augusta Factory*, 92 Ga. 712, 18 S. E. 974; *Bailey* v. *Delaware etc. R. R. Co.*, 40 N. J. L. 23; *Shadford* v. *Ann Arbor St. Ry. Co.*, 111 Mich. 89, 69

N. W. 661; *Rogers* v. *Louisville & N. Ry. Co.,* 88 Fed. 462; *Fritz* v. *Salt Lake etc.,* 18 Utah, 493, 56 Pac. 90.)

For Respondent, there was a brief by *Messrs. Maury & Templeman,* and *Messrs. J. O. Davies* and *J. B. Coppo;* and oral argument by *Mr. H. L. Maury.*

Appellant insists that the motion for nonsuit should have been granted, for the reason that plaintiff was engaged in the creation of a place, or in making a dangerous place safe; and that because of the character of the work the plaintiff was engaged in the defendant did not owe the plaintiff any duty to furnish the plaintiff with a safe place in which to work. The principle of law applicable is to the effect that the servant, when sent to create a place or make a dangerous place safe, assumes only the risk of dangers and defects which are incident to and naturally flow from the work which he is doing, and those which he knows about or which he could discover by the exercise of ordinary care, and as to all other dangers and risks if brought about by the negligence of the master and the servant is injured, the master is liable. (White on Personal Injuries in Mines, sec. 479; *Allen* v. *Bell,* 32 Mont. 69, 79 Pac. 582; *Hardesty* v. *Largey Lumber Co.,* 34 Mont. 153, 86 Pac. 29; *Bunker Hill & Sullivan etc. Co.* v. *Jones,* 130 Fed. 813, 65 C. C. A. 363, a case in many respects very similar to the present one.)

Appellant further contends that its motion for a nonsuit should have been sustained because the plaintiff ''assumed all the risks of the accident which occurred.'' We admit that the law is as contended for by the appellant, and as found in the numerous cases decided by this court and cited in appellant's brief under this head. In fact, the law governing assumption of risk as applicable to this case is so well and thoroughly settled by this court that it is unnecessary to cite cases. The only question is: Did the plaintiff assume the risk of the accident which occurred to him when the well-known principles of law governing the case are applied to the facts? We contend that he did not. Even the appellant admits that the risk of the accident which happened in this case was an extraordinary risk,

and we have yet to discover any case holding that a servant in any sense assumes an extraordinary risk unless he knew about it or could discover it by the exercise of ordinary care and caution.

Appellant again contends that it is necessary for the plaintiff to allege knowledge upon the part of the master before he could recover in this case. The plaintiff sufficiently alleged knowledge on the part of the defendant. However, it is our contention that the complaint would be sufficient in this regard without any direct allegation of knowledge on the part of the master, as the complaint alleges ''that the defendant had negligently permitted the said place to become unsafe and dangerous, and through the negligence of the defendant said place was unsafe and dangerous''; and ''over the same two long stringers had been negligently placed above the set and resting on the said last set'' by the defendant. Under these allegations it would not be necessary for the plaintiff to directly allege knowledge on the part of the master. (*Hollingsworth* v. *Davis-Daly Estates Copper Co.,* 38 Mont. 143, 99 Pac. 142.)

Respondent admits that this action is an action at common law and not under the fellow-servant statute. He, however, does contend that Joe Wells, at common law, as to his acts relative to the timbering which caused this injury, was a vice-principal of the master, and not a fellow-servant of the plaintiff. The master in this case retained unto itself the superintendency in the minutest detail of the timbering in the mine and the making of the mine safe by timbering, and when the master retained to itself the direction and superintendency of the timbering in the mine in the minutest detail, it is responsible for any negligence on its part in that regard. (*Hall* v. *Northwestern Lumber Co.,* 61 Wash. 351, 112 Pac. 369; *Poli* v. *Numa Block Coal Co.,* 149 Iowa, 104, 127 N. W. 1105, 33 L. R. A., n. s., 646.) Again, when Joe Wells directed the manner of timbering in the mine, he was, under the evidence, making the mine safe and making the place safe, and was performing a nondelegable duty of the master, and it would matter not whether he was shift boss or held a lower grade of service under the mas-

ter, the master would be liable for his acts. (*Gregory* v. *Chicago, M. & St. P. R. R. Co.*, 42 Mont. 551, 113 Pac. 1123.)

In *Gregory* v. *Chicago, M. & St. P. Ry. Co.*, *supra*, and *Cummings* v. *Reins Copper Co.*, 40 Mont. 599, 107 Pac. 904, this court has held that evidence of common custom or common usage may be introduced as tending to show due care or want of negligence, but that the custom or general practice must still be reasonably safe or reasonably prudent; and as to whether or not the general custom or general practice is reasonably safe or reasonably prudent is still a question which may be inquired into by a court and jury; and this is, and we believe must be, the law. It was so laid down by the supreme court of the United States in the case of *Texas etc. R. R. Co.* v. *Behymer*, 189 U. S. 468, 23 Sup. Ct. 622, 47 L. Ed. 905, in the following language: "What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by the standard of reasonable prudence, whether it is usually complied with or not." In *Chicago etc. R. Co.* v. *Carpenter*, 56 Fed. 453, 5 C. C. A. 551, the court said: "It will not be contended that a custom will excuse a person from having been negligent any more than it will justify in committing a crime." (See, also, *Homestake Min. Co.* v. *Fullerton*, 69 Fed. 923, 16 C. C. A. 545; *Maynard* v. *Buck*, 100 Mass. 40; Wigmore on Evidence, sec. 461; 26 Cyc. 1108; Thompson on Negligence, par. 7882; Labatt on Master and Servant, sec. 50.)

MR. JUSTICE SMITH delivered the opinion of the court.

Action by employee against employer for damages growing out of personal injuries sustained in the Speculator mine. Plaintiff had a verdict and judgment for $1,500. Defendant appeals from the judgment and also from an order denying a new trial.

The complaint charges: "That the defendant commanded and ordered the plaintiff on the 27th day of January, 1910, to go to work at, and in obedience to such command the plaintiff went to work at, No. 1696 stope connected with the main shaft of the defendant of the Speculator quartz lode min-

ing claim; that the defendant had negligently permitted the said place to become unsafe and dangerous, and, through the negligence of the defendant, the said place was unsafe and dangerous at the time that plaintiff went to work there through the command of the defendant, for that the said place was in loose ground, there was much loose rock and boulders hanging above the said place, and the same was negligently and insufficiently timbered in that the last set of timbers in front of the face had been placed in permanent position, and over the same two long stringers had been negligently placed above the set and resting on the said last set, and the said large amount of rocks and boulders and dirt had been by the defendant negligently left hanging and resting on the said stringers, so that there was a great and extraordinary weight on the said stringers, and consequently on the said set, with a tendency to crush the said set forward and collapse the same, there being an excavation under the said set and beyond the same to the face—the said face being about thirty feet distant from said set; that the defendant knew of the dangerous condition of the said place before it set the plaintiff there to work and before the plaintiff went there to work, or if the defendant had used reasonable care it would have known of the dangerous condition of the said ground; that the plaintiff did not know of the unsafe condition of the said set, and of the unsafe condition of the said place before he went there to work; that immediately upon the arrival of the plaintiff at the said place, the said ground above the said stringers collapsed, and the set collapsed and the ground came down upon the plaintiff.''

The answer, in addition to a denial of any negligence on the part of the defendant, alleges that the plaintiff was injured by reason of a lack of ordinary care on his part, that his own negligence and that of his fellow-servants contributed directly to his injury, and that he was engaged in making safe the place where he was injured, and therefore assumed the risk of injury.

It will be noted that the complaint charges primary fault on the part of the defendant in that it had negligently placed two long stringers above the set, resting on the set, upon which a

large amount of rock, boulders, and dirt were negligently allowed to rest, so that there was an extraordinary weight thereon "with a tendency to crush the set forward and collapse the same." It is then charged that immediately upon the arrival of plaintiff "the ground above the stringers collapsed and the set collapsed." The collapse is presumably to be attributed to the negligent acts of the defendant already pleaded, although the complaint does not in terms so charge.

1. It is contended by the appellant that the charge in the complaint that the stringers were "negligently placed" must be construed to mean, simply, that it was negligence to place stringers there at all, and that it could not mean that they were placed in a negligent manner. On the other hand, the respondent argues that the phrase is sufficient to allow proof that the stringers were placed in a negligent manner in that the sets were not properly "laced" and the leading set was not "breast-blocked" or "angle-braced." It is also contended for the respondent that the complaint charges generally that the place was negligently and insufficiently timbered. We do not agree with any of these contentions. In our judgment, [1] the complaint, liberally construed, charges that the stringers were placed in a negligent manner, and that a large amount of rock, boulders, and dirt was negligently allowed to rest thereon, but it fails to charge any negligence in failure to lace, breast-block, or angle-brace. There is no general allegation that the place was negligently or insufficiently timbered. The allegation is special and to the effect that the stringers were placed in a negligent manner, considering the fact that an extraordinary weight rested upon them. We are not to be understood as holding, however, that the absence of lacing, breast-blocks or angle-braces on the leading set could not be taken into consideration in determining whether, under the circumstances, the stringers were negligently placed. There is, however, no substantial testimony to justify the conclusion that the use of breast-blocks was practicable.

We hold that there was no material variance between the allegations of the complaint as above construed and the facts proven by the respondent.

2. The next contention of the appellant's counsel is that the court erred in overruling their motion for a nonsuit.

Although it is so alleged in the complaint, there is no testimony to warrant the conclusion, and indeed it was not claimed at the trial, that there was any negligence in allowing the loose rock to hang over the stringers. So that the only negligence complained of was that the stringers were negligently placed. It is also contended by counsel for the appellant that not any negligence could be predicated upon the fact that blocks were placed under the stringers for the purpose of tilting them up to an inclined position, thus increasing the liability of the forward set collapsing, and rendering the method employed defective. The complaint does charge, however, as aforesaid, [2] that the stringers were negligently placed, and we think the matter of blocking was incident to the placing of the stringers and fairly comprehended in the allegation. A special demurrer might have been employed to bring out these specific matters before trial.

We quote such portions of the testimony as we deem necessary to illustrate the situation at the time of plaintiff's injury. [3] He testified: "On the 27th day of January, 1910, I was working on the 1696 stope of the Speculator mine. Me and my partner went down from the 1200 and two shovelers went with us, and the other two miners that was working partners with us, they came from the 1600 up. We congregated there about four sets from the set that collapsed. We could see from where we were standing that the sets had not been laced and our two partners went back to the manway to get lacing. We started to go to look at the place. We didn't have time to realize the danger of the place. We simply went into the place and just got in front of the two posts when the two sets went ahead. I say the two sets, because only two of the posts were laced and it pulled the second set out with

the first posts. I didn't have much time to realize what was the cause of it. There was a lot of ground came with it. I was hit in the face with a cap and knocked down and injured. I was holding my light up this way, looking at the back, to see what had been done by the shift previous. I had been last at that point on the previous shift some sixteen hours before. I just had time to walk in and turn around when it came in on me. It would be better if it had not been laced at all than to be laced on one side. The stringers were cribbed up to the roof in front, as near as I could see in the time I had. There were some blocks under the back end of the stringers, the tail end, under the second cap, making the stringers higher at the front end. During that time I just walked in front of the post to look and see in what condition the place was and if there was any danger existing. The object of putting stringers in a mine like that is to catch the back so a man can work ahead, if they are put in correctly. The function of the stringers is to sustain the back, to keep the men safe who are going to put in the next set ahead. A timber at forty-five degrees will sustain more weight than a timber at approximately twenty degrees, because it is straighter; it holds more when it is straighter than when it leans over more. Morrow, my partner, was a timberman and we worked together. On the night of the 27th we went back there to do some work, to timber—that is, to take the place up where it was left off; and whatever condition the shift ahead of us left it, we were to go ahead with the work. We were both experienced men. The purpose of timbering a place like this stope is to make it safe for the men that are working there—miners, shovelers or whoever they are. I didn't know the conditions that existed in there; I didn't know that the cave was in that shape, because they worked into it the shift previous. I was there twenty-four hours before this time, but I didn't see this cave because they hadn't broke into it yet. * * * When I went to work there on the 27th, after I got in there to look at the place I see the big opening and the ground that was lying on the second

floor. It was considerably different from the way it was when I left it that morning; it had caved a whole lot more and these stringers had been put in over the set. I am almost sure that Morrow and I set those last two posts and the cap on the shift before, but we didn't complete it. At that time there was no necessity for stringers and we didn't put stringers in. What caused these men to go after lacing was that we could all see that the place had not been laced, and that would be the first thing before any timbers were put in, would be to lace the sets together if we couldn't breast-block them. We could see that lacing was necessary to make the set stand—to keep it from going ahead. Lacing would not have done that. It might have helped not to go ahead, but if five or six sets had been laced, with the weight that came on those stringers, they would have went ahead just the same. * * * That is not a proper way to put in stringers. I would have to duck my head going under the tail end of the stringers to avoid hitting them so I would certainly know they were there. The difference in height at the forward end would be that it would take that much more cribbing and it would take that much more work to put the cribbing in. And another difference would be that when they are standing more upright that way it has more of a tendency to push the set ahead when they took weight. That is almost impossible to stop, unless it was properly blocked. I could see the angle of the stringers before I got to the place where I was struck. I saw that the angle of these stringers made them dangerous just as soon as I got in front to see what was on top of them, to see what was hanging there. If I had put those stringers in there I wouldn't have put them under one cap and over the other; I would have put them over both caps, if it took all the lagging in the mine. I would have put a stull across and would have cut a hitch in both walls. Any man, if he went to put stringers in over a set, the first thing he would do, he would see that they would be sufficiently braced so they couldn't go ahead and collapse the timbers, even while he was putting them in. That is what we were going to do with the lacing, but after I seen it in front I wouldn't have

done that. I would have known then that, with the ground that was hanging there, the lacing wouldn't have held them. We each had a candle light.''

James J. Dwyer testified for the plaintiff: ''On the 27th of January I was in there to put in some stringers, to catch the place up. I was working that day under the orders of Joe Wells. He was not present during the progress of putting in those stringers. He gave orders to put them in. He was the shift boss. A shift boss would come around and tell us what to do and how to do it and where to do it and when to do it, and it was the duty of the employee to obey these orders. Wells was present about five minutes before we quit on that shift. He seen the work that was done when he came in there. With reference to the timbering, it was exactly in the same condi-- tion when we quit as it was when Wells was last in there. With reference to lacing, when we left we had the first and second posts laced together on the hanging and that was all. The taking of weight on the stringers would have an effect to push the leading set on which the stringers rested ahead, the way the stringers were put in. From the character of the ground, one familiar with mining would naturally expect the stringers to take weight when the ground settled on them. After putting in the stringers and catching the back up, our object was to go ahead and put in another set of timbers and use the same course in going ahead until we made the place safe. Over these stringers we put some 10 by 10 timbers, and I think we finished up with 5 by 10 for cribbing from the stringers to the back.''

Patrick Kinney testified for the plaintiff: ''Wells, the shift boss, told us to get some stringers in and tail them down with 10 by 10 blocks, so as to save cribbing on top of them. It wouldn't take so much cribbing to crib up the back. We done just what he told us. The stringers weren't level. They couldn't be level. They were right on the edge of the front cap, so that the weight was pressing ahead. If any weight came, I should think it would take weight to go ahead. The stringers and the timbers in the leading set would go ahead.

They were in the same position when we left them that they were when Mr. Wells, the shift boss, last saw them. He was there about five or ten minutes before we left. After the shift boss left, we were working out to put a post and girth on the footwall side. There was no more work done on those stringers. We all took orders from Joe Wells. When we left there, the leading set was laced back to the other post on the hanging-wall side, but not on the foot. If it had been laced on the foot as well as on the hanging, I think it would have been stronger. Those stringers could have been supported in front if there was timbers put under them, but I couldn't answer whether they would have stood better if they had had props under them. If the stringers had rested level I think the weight would have come straight down on them and not at an angle. In that case I don't believe that set would have collapsed so fast. We were all working there for the same end, to make this place safe, so we could go ahead with the timbering. If we cribbed these stringers from the tail end to the forward end and there were loose rocks in the top, I guess the weight would come down on those stringers practically even all over. After we put these stringers in we went forward underneath them, to work out for another set ahead of this leading set. We put the stringers in to protect ourselves and hold the back while we were doing the work. The reason why we didn't go ahead and lace was that the shift boss, Joe Wells, came in and told us to work ahead and get a post and girth in over the foot side, and we forgot all about lacing further, I guess. We could have laced those sets back for three or four sets in ten minutes. I didn't think it was safe to go in under those stringers to work out for that set; you couldn't. It would have been safe if there had been a set of timbers stood under those stringers, and that is what we were doing, working out for another set; and until we got that other set in and cribbed up to the back, I don't think the place could be made safe. I was afraid to go in there when I was there working. I was afraid this leading set would collapse. If we put in those stringers level, we would have had a whole lot more cribbing to put up on top of them.

When Wells told us to put the stringers in, we did not feel that that was the way it should be done; we were objecting to putting in those 10 by 10 blocks ourselves and not tailing them down so much. We did not say anything about that to the shift boss, but the four of us spoke about it amongst ourselves. The reason we didn't lace back four or five sets, we forgot all about it.''

Plaintiff then introduced in evidence, over defendant's objection, certain portions of the answer, in which it was alleged that ''plaintiff knew and appreciated the dangerous character of the place,'' that he had full knowledge ''of the dangerous condition of the place,'' and that defendant had caused the stope, together with the timbers and other appliances therein to be carefully inspected and throughly examined at frequent intervals. This ended plaintiff's case in chief, but as it was materially strengthened, or at least corroborated, we think, by certain of the defendant's witnesses, we shall give a summary of their testimony:

Joseph T. Wells testified: ''When I came down there and seen the place was down I ordered them to put in stringers and crib the back. When I [afterward] came around there I asked them why the blocks were in there, and they said they put them in there so they wouldn't have so much cribbing to pack. When I left them they had the hanging-wall laced and I supposed they were going to finish up the lacing on the footwall side, to hold it from going forward. What I supposed would be done was that the posts would be laced back. My duties were looking after the shift, and that embraced the mining and timbering of the stopes and the reporting of any dangers to the management. It was my duty to look out for dangers and report them to the management. It was my duty to look out for dangers in this particular place and to discharge men who did not suit me, but not to employ men. I had 90 or 100 men under me. Lacing would not have had very much effect on those sets if that ground had broke off big, lacing wouldn't have been much support to them. Of course it would have helped a little, but it wouldn't have been no great support. I do not

think that was the right way to put in stringers. As to putting angle-braces in from the cap of the leading set to the cap of the next set ahead on the floor below, that could have been done, and it would have supported it some from going ahead. I don't know whether bracing in that way would have pre-vented this accident or not; that is just speculation on my part. Angle-braces probably would have helped to prevent such an accident. When I said that the stringers was not proper I meant that the blocks under the tail hadn't ought to have been put in. I don't believe that angle-braces would have done much good there because they would have been too straight to have had much effect on the timbers. Under circumstances such as these, it has been the custom in the Speculator mine to put in stringers and crib up to the back and put in lacing. I did not order blocks under the tail end of the stringers. The blocks were in when I got there in the afternoon and I saw them there then. The management knew that stringers were always put in in the way these were, but this was the first instance that stringers happened to be put in with those blocks under them. They did not take those blocks out when I was there in the afternoon. It was too late then to take them out, for they al-ready had the cribbing all on the stringers. Those blocks were improper because they made just a little more tilt to the stringers, that is all. 'Q. Mr. Wells, when you spoke of block-ing being improper, you meant that it added to the danger of that structure falling down? A. Well, in this particular case, it didn't make very much difference in regard to them stringers, because, at that time, when I came around there and seen these blocks in, I spoke to the fellows and told them they hadn't ought to have put them in, that it was not the custom. It was too late to take them out and I asked them if the ground was sloughing or anything, and they said no; that everything was perfectly quiet and I let it go at that. I knew that there would be a different shift of men come on in an hour or two.' "

William Judson: "I considered that these stringers over the leading set were put in proper when we put them in. The reason those lacings were not put on, according to the instruc-

tions of the shift boss, was that we forgot about it, I guess. Those stringers were put in according to the custom of miners. I considered it so. The shift boss told us to put the stringers in, but he didn't mention anything about those blocks that we tailed them down with. These blocks were put in in the ordinary way that I saw them put in. I guess there was a tendency to crush that leading set forward if any ground fell. I have seen stringers placed over a cap just as these were in other mines.''

Nick Tepish: ''There is a general rule among miners, when they get up to a place, the first thing is to go in and see how the place looks.''

T. E. Mitchell, Jerry Sullivan, Andrew J. Daum and James McQuayd, all mine foremen in Butte, testified in effect that it was customary and proper to place stringers as those in question were placed, including the blocking on and under the caps.

Ted Loftus, defendant's witness, testified: ''I could see that the place was dangerous all right, but I did not see that it was about to fall. It might catch all four of us all at once all right. I could see that in a second.''

Will Morrow, plaintiff's partner, so called, testified: ''I am acquainted with the ordinary and usual customs of timbering in stopes in this camp, and these stringers were put in in the ordinary and customary manner. When Loftus and Nick went back after the lacing, it was understood between the four of us— of course, we knew that Kinsel and I had to stand the timbers. It was our duty to stand the timbers, and we would have to do that before they could do any mining at all. So Kinsel and I went in to clean out, to stand the set, while they were after the lacing. I went in on the footwall side, and was cleaning out the tenon with my hand, and Kinsel was standing on the other side from me, and he was under the cap of the last set, and I believe he was barring down some boulders on that side, and that is all I remember. The pressure of these tail blocks didn't add to the weight on the cap. I don't know why those stringers fell. Nothing in the world could hold the ground when it starts.''

We shall not consider the motion for a nonsuit further, for the reason that at the close of all the testimony appellant moved for a directed verdict on all the grounds advanced in the first motion, and one additional ground. We shall examine all of the contentions urged upon us in connection with the latter motion.

3. In our judgment the plaintiff made out a *prima facie* case of primary negligence on the part of the defendant, by proving that the method adopted by it for holding the back by means of inclined stringers was a negligent one. It was shown that the great weight resting upon these stringers in their inclined position had a tendency to crush the last set forward, and that the set collapsed, thus causing the plaintiff's injury. Plaintiff, who was an experienced timberman, testified: "A stringer holds more when it is straighter than when it leans over more. The difference in height at the forward end would be that when they are standing more upright that way it has more of a tendency to push the set ahead when they took weight. I could see that the angle of these stringers made them dangerous just as soon as I got in front to see what was on top of them, to see what was hanging there. If I had put those stringers in there I wouldn't have put them under one cap and over the other. I would have put them over both caps, if it took all the lagging in the mine. I would have put a stull across and would have cut a hitch [niche?] in both walls. Any man, if he went to put in stringers in over a set, the first thing he would do he would see that they would be sufficiently braced so they couldn't go ahead and collapse the timbers." Dwyer testified: "The taking of weight on the stringers would have an effect to push the leading set on which the stringers rested, ahead, the way the stringers were put in. From the character of the ground one familiar with mining would naturally expect the stringers to take weight when the ground settled on them." Kinney testified: "Wells told us to tail them down so as to save cribbing on top of them. The stringers weren't level. They were right on the edge of the caps so that the weight was pressing ahead. If any weight came I should think it

would take weight to go ahead. The stringers and the timbers in the leading set would go ahead. Those stringers could have been supported in front if there was timbers put under them, but I couldn't answer whether they would have stood better if they had had props under them. If the stringers had rested level, I think the weight would have come straight down on them and not at an angle. In that case I don't believe that set would have collapsed so fast. I didn't think it was safe to go in under those stringers. It would have been safe if there had been a set of timbers stood under them. I was afraid this leading set would collapse. When Wells told us to put the stringers in we did not feel that that was the way it should be done; we were objecting to putting in those blocks ourselves.'' Wells testified: ''I do not think that was the right way to put in stringers. When I said that the stringers was not proper I meant that the blocks hadn't ought to have been put in. Those blocks were improper because they made just a little more tilt to the stringers.'' Judson testified: ''I guess there was a tendency to crush that leading set forward if any ground fell.''

It is perfectly clear to us that if the jury believed this testimony, they were justified in finding that the defendant had adopted a negligent method of placing the stringers and that the faulty means so adopted caused the first set to collapse and go forward, thus striking the plaintiff and causing the injuries.

(a) It is insisted that the motion for a directed verdict should have been sustained, for the reasons that the place where plaintiff was working was not a completed place; that it was being created by plaintiff and his fellow-servants; that it was constantly being changed in character by the labor of the men working upon it; that the dangers were short-lived; that the plaintiff was engaged in making the place safe. It is said that under these circumstances no duty rested upon the defendant to furnish the plaintiff a safe place in which to work, but, on the contrary, the latter assumed the risk of injury incident to such work.

(b) In this connection it is also argued that the evidence discloses as a matter of law that the plaintiff, an experienced timberman, knew and appreciated the dangers arising from the fact that the forward set had not been laced, and that the stringers were blocked up to an inclined position. It is unnecessary to again quote the evidence on this point. Suffice it to say that in our judgment it was a question of fact for [4] the jury to determine whether he knew and appreciated the peril of his situation when he went forward to inspect the work which had been done in his absence. He himself testified that although he noticed the inclined position of the stringers and the blocking on and under the respective caps, he had no notion of the danger to be apprehended until he observed the weight of the load resting upon the stringers, and then it was too late to seek a place of safety, because the forward set immediately collapsed.

(c) Again, it is contended that there is an absence of a necessary allegation in the complaint that the defendant knew of the defects which caused the set to collapse. Even so, the defendant, in the discharge of a primary duty, having constructed [5] the appliance, designed to hold the back, is chargeable with notice of any defects therein. This court said in *Hollingsworth* v. *Davis-Daly Estates C. Co.*, 38 Mont. 143, 99 Pac. 142, that knowledge by the defendant is generally regarded as sufficiently averred by an allegation that the defendant negligently permitted appliances to become defective. The rule applies with even greater force to a case where it is averred that the defendant was negligent in its original plan of construction.

(d) It is contended that the plaintiff was guilty of contributory negligence. What has already been said on the subject of knowledge and appreciation of danger disposes of this assignment. It involved a question of fact for the jury.

(e) It is suggested that if any negligence is established, it was that of servants of the defendant and fellow-servants of the plaintiff, and, as the complaint charges primary negligence, there was a failure of proof. We think the evidence of the plaintiff's witnesses tends to prove primary negligence on de-

44 Mont.—30

fendant's part, as we have already indicated, and shall here-after more fully show when we consider the evidence touching
[6] the part taken by Wells, the shift boss, in the construction of the supports to the back. We agree that this is a common-law action, and if the negligence of Wells as a fellow-servant were relied on, it would be necessary to declare upon the statute (sec. 5248, Rev. Codes). (See *Kelly* v. *Northern Pacific Ry. Co.*, 35 Mont. 243, 88 Pac. 1009; *Thurman* v. *Pittsburg & Mont. C. Co.*, 41 Mont. 141, 108 Pac. 588.) But Wells was a vice-principal, as we shall show.

Recurring to point "a" above: It is not altogether clear from the testimony that that part of the stope in which the back was supported by stringers was not a completed place (see 4 Thompson on Negligence, sec. 3982); but, be that as it may, we are satisfied that under the circumstances shown it may not be said, as a matter of law, that the defendant owed no duty to its servants to keep the place reasonably safe. When the casualty is caused by a latent defective condition of the place of work, or latent defective conditions surrounding the place of work, rendering it extraordinarily dangerous, and such latent defective conditions are the proximate result of a
[7] negligent and faulty plan or method adopted by the master for doing the work, and the servant is not chargeable with notice of such defective conditions, he does not assume the risk thereof, even though he be engaged in making the place or making it safe. (See *Faren* v. *Sellers & Co.*, 39 La. Ann. 1011, 4 Am. St. Rep. 256, 3 South. 363; *Severance* v. *New England Talc Co.*, 72 Vt. 181, 47 Atl. 833; *Illinois Steel Co.* v. *Schymanowski*, 162 Ill. 447, 44 N. E. 876; *Wahlquist* v. *Maple Grove C. & M. Co.*, 116 Iowa, 720, 89 N. W. 98; *Clark* v. *Liston*, 54 Ill. App. 578; *Faulkner* v. *Mammoth M. Co.*, 23 Utah, 437, 66 Pac. 799; 1 Labatt on Master and Servant, sec. 29; *Meloy* v. *Chicago & N. W. Ry. Co.*, 77 Iowa, 743, 14 Am. St. Rep. 325, 42 N. W. 563, 4 L. R. A. 287; *Madden* v. *Minneapolis & St. L. Ry. Co.*, 32 Minn. 303, 20 N. W. 317; *Van Amburg* v. *V. S. & P. R. Co.*, 37 La. Ann. 650, 55 Am. Rep. 517; see, also, *Hanley* v. *California B. & C. Co.*, 127 Cal. 232, 59 Pac. 577, 47 L. R. A. 597.)

4. As an additional reason why the motion for a directed verdict should have been granted, it is urged that it was shown, without contradiction, that the place where the accident occurred was timbered in the usual and ordinary manner employed by careful and prudent miners in timbering like places, and therefore there could be no negligence in so timbering. It is sufficient to say in answer that the testimony on this branch of the case was conflicting; the defendant's own witness Wells testified, in effect, that the stringers were not placed in the usual and customary manner.

5. What has already been said disposes of the contention that the complaint does not state facts sufficient to constitute a cause of action.

6. Again, it is claimed that the court erred in receiving testimony touching the powers and duties of Wells, the shift boss, and of what he said and did in connection with the work of placing the stringers. It is argued in the brief that the sole purpose of this testimony was to hold the defendant liable on the doctrine of the maxim *respondeat superior*. As has heretofore been said, however, such was not the purpose of the [8] testimony. The evident purpose was to show that Wells was a vice-principal. He was engaged in performing a primary absolute and unassignable duty of the master, to-wit, in making the place reasonably safe. This fact in itself takes him out of the category of fellow-servants and makes him a vice-principal. Such duties as he was authorized to perform—that is, devising means to hold up the back so as to protect the employees of the defendant—could not be delegated by the master to a servant so as to escape responsibility to other servants for their careful performance. (See *Kelley* v. *Fourth of July Min. Co.*, 16 Mont. 484, 41 Pac. 273; *Allen* v. *Bell*, 32 Mont. 69, 79 Pac. 582; *Hill* v. *Nelson Coal Co.*, 40 Mont. 1, 104 Pac. 876; *Gregory* v. *Chicago, M. & St. P. Ry. Co.*, 42 Mont. 551, 113 Pac. 1123.) His negligent act was that of the master itself.

7. Contention is made that the court erred in allowing plaintiff's counsel formally to introduce in evidence those portions of defendant's answer heretofore indicated. We find no pre-

judicial error in this ruling. Counsel in addressing the jury [9] might found any reasonable argument upon the allegations of the answer, and it was entirely unnecessary to introduce the pleading or any portion of it, in evidence, for that purpose. No claim is made that any unwarranted or prejudicial argument was based upon the pleading, or that any unjustifiable conclusions were drawn from it. If, perchance, an unwarranted construction had been placed upon the allegations of the answer by counsel for plaintiff, we have no doubt the learned district judge would readily have corrected it on request.

8. The conclusions heretofore reached dispose, in effect, of all of defendant's assignments of error founded on the refusal of the court to give certain offered instructions, save that directed to instruction No. 4, which we shall hereafter consider.

9. At the request of the plaintiff the court gave to the jury the following instruction: "No. 5A. The duty of the master to [10] use ordinary care to provide a reasonably safe place for work in his premises is one which is termed a nondelegable primary duty of the master; in other words, the law does not permit, or suffer, the master to shift his responsibility for performance of this duty onto the shoulders of any other servants (than the servant claiming to be injured) so as to relieve the master from liability. If the master does delegate or turn this duty over to any other servant, and such servant is negligent, then under the law such negligence is the negligence of the master, whether such master be corporation or natural person. You are further instructed that this instruction is to be considered with the other instructions which precede and follow it."

As already indicated, we think this instruction correctly states the law and is applicable to the facts in this case.

10. Over the objection of the defendant the court also instructed the jury as follows: "No. 6A. The jury are instructed [11] that where the master has created a place for work of his servants and such place is permanent under the master's general course of work, then the master owes to the servant a duty under the law to use ordinary care to the end that the

said place be and remain reasonably safe, such duty is a continuing one, and is a nondelegable, primary duty of the master.''

As heretofore stated, there is some substantial evidence to the effect that the place over which the stringers projected was finished for the time being, and we think, therefore, there was no error in giving the instruction.

11. The court refused to give defendant's offered instruction No. 4, which reads as follows: ''No. 4. If the jury believe from the evidence that the place in which the plaintiff went to work at the time the injury occurred to him, in so far as same [12] had been timbered, had been timbered in the usual manner, and according to the usual custom employed by reasonably prudent and skillful persons engaged in the occupation of quartz mining in timbering like places, then there was no negligence in the timbering of the same.''

We regard this action of the court as prejudicial error. About the only defense interposed was that the work was done in the usual and customary manner and that such custom was established by prudent and skillful miners. Under these circumstances the questions of fact should have been submitted to the jury whether the work was done in the usual and customary way and whether that method was the one employed by prudent and skillful miners under like circumstances. If they had resolved both of these questions in the affirmative, they should have found for the defendant. ''Prudent'' means sagacious in adapting means to ends; circumspect in action, or in determining any line of conduct; practically wise; judicious; careful; discreet; circumspect; sensible; opposed to *rash;* as a prudent man; dictated or directed by prudence or wise forethought. (Webster's New International Dictionary; see, also, 6 Words and Phrases, 5770.) A reasonably prudent person, as the term is used in the instruction, means a reasonably careful person.

To follow the usual custom in providing places or furnishing appliances is not alone sufficient, for, as suggested by Mr. Thompson in his work on Negligence (volume 4, sec. 3770), the ''ordinary care'' of certain employers may be habitually and criminally negligent. The degree of care required to exonerate

from a charge of negligence is that which is commonly and usually exercised by reasonably careful persons under like circumstances; that is to say, reasonable care. Mr. Thompson also says: "Applied to the subject of machinery and appliances furnished by the employer to his employee, the meaning is that the [13] employer does not perform his duty to an employee by furnishing appliances or machinery such as are ordinarily used by persons in the same line of business, unless they are reasonably safe and sound or he has used due care to have them reasonably safe and sound. The standard is not what men ordinarily do under like circumstances, but what reasonably prudent and careful men, having regard for the rights and safety of others, do under like circumstances." The result of any other rule would be that employers of labor, in any given industry, by a general neglect and inattention to their social duties, could make a rule of law for their own exoneration. The supreme court of Maine in *Mayhew* v. *Sullivan Mining Co.*, 76 Me. 100, and again in *Sawyer* v. *J. M. Arnold Shoe Co.*, 90 Me. 369, 38 Atl. 333, said: "Ordinary care is such care as persons of ordinary prudence would have exercised under like circumstances. It does not depend upon custom. It would be no excuse for want of ordinary care that carelessness was universal about the matter involved, or at the place of the accident or in the business generally." This court in *Forquer* v. *Slater Brick Co.*, 37 Mont. 426; 97 Pac. 843, quoted with approval the text of 26 Cyc. 1108, as follows: "While not conclusive on the question of negligence, evidence is generally admissible in an action for personal injuries to show whether or not the master's machinery, appliances, ways, and methods are such as are in ordinary and common use by others in the same business." But, of course, this is only evidentiary, and, in addition, it must be shown that such ordinary and common use was reasonably prudent under the circumstances of the particular case; and one way to show that is to prove that it was resorted to by reasonably careful employers under like circumstances. No different rule is laid down in *Cummings* v. *Reins C. Co.*, 40 Mont. 599, 107 Pac. 904, or *Gregory* v. *Railway Co.; supra*. It is not the

common custom, in itself, which exonerates, but proof of the custom, coupled with proof that it is the usage of ordinarily prudent and careful men under like circumstances, will absolve an employer adopting the same appliance or method, from a charge of negligence, because the degree of care exercised by ordinarily prudent men in the same circumstances is the standard by which a jury must be guided in an instant case.

For error in refusing to give the last instruction considered, the judgment and order are reversed, and the cause is remanded for a new trial.

*Reversed and remanded.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.