McKINSTER, Respondent, *v.* PRESCOTT, Appellant.

(No. 5,112.)

(Submitted April 4, 1923. Decided April 16, 1923.)

[214 Pac. 639.]

*Livestock—Agisters—Breach of Contract to Winter and Return in First-class Condition—Negligence—Custom—Erroneous Instruction.*

Livestock — Agister — Breach of Contract to Care for During Winter — Negligence—Custom in Neighborhood—Erroneous Instruction.

1.  Plaintiff contracted to care for, feed and keep defendant's livestock in first-class condition during the winter months and redeliver them in the spring in that condition. In an action for a balance due him under the contract defendant interposed a counterclaim for damages suffered by reason of defendant's failure to keep and redeliver the stock as agreed. The court instructed the jury that in determining whether plaintiff had redelivered the stock in first-class condition they should take into consideration the climatic conditions prevailing during the time the animals were in charge of plaintiff, and the condition of livestock of the same character generally in the neighborhood where they were kept, at the time redelivery was made. *Held,* that the instruction was faulty in that it conveyed the erroneous ideas that if the winter was a severe one plaintiff would not be required to deliver the stock in as good condition as if it had been a mild one, and because under it the jury could justify plaintiff if the stock was in as good condition as other livestock in the same neighborhood, though the owners thereof were habitually careless and negligent in their management or were forced from necessity to permit their animals to winter upon a grossly inadequate supply of feed.

1. Liability of agister under special terms of contract for care or return of subject of agistment, see note in **L. R. A.** 1915B, 302.

Negligence—Custom—When not Justification of Negligent Conduct.
  2.  One charged with negligence cannot justify his conduct by a
  custom established by others through inattention to and neglect of
  their duties, but must show that the care which he exercised was
  the care usually exercised by reasonably prudent and careful persons
  under like circumstances.

*Appeal from District Court, Beaverhead County; Jos. Smith, Judge.*

Action by Harry McKinster against A. K. Prescott.  Judgment for plaintiff, and defendant appeals.  Reversed and remanded for new trial.

*Mr. T. B. Weir,* for Appellant, submitted a brief.

*Messrs. Norris, Hurd & Collins,* for Respondent, submitted a brief; *Mr. Edwin L. Norris* argued the cause orally.

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

In 1919 plaintiff held under lease the Spur ranch in Beaverhead county, and defendant owned sheep and cattle which he desired to have cared for and fed during the ensuing winter. In October, 1919, the parties entered into a contract in writing, by the terms of which plaintiff agreed to pasture, feed, water, and salt approximately 1,000 ewe sheep, 25 bucks, and 170 cattle belonging to defendant, and to redeliver the sheep on April 1, 1920, and the cattle on April 15, 1920.  By the terms of the contract, plaintiff agreed to confine the stock to the Spur ranch by sufficient fences or herders to "care for, protect, pasture, feed, water and salt all said livestock at said Spur ranch in a first-class manner and according to the rules of good husbandry"; to "furnish and feed to said stock at said ranch good and ample pasture and ample hay as may be necessary to keep said stock in first-class condition at all times" and redeliver all said livestock to second party [Prescott] or his agents at said ranch in first-class condition."  However, plaintiff was relieved of responsibility for any of the stock that died through

natural causes not due to neglect but agreed to deliver to defendant the pelts or hides of such animals. The feed for the bucks was to be provided by the defendant. For the services so to be rendered by plaintiff, defendant agreed to pay $3,50 per head for the sheep and $15 per head for the cattle.

By this action plaintiff seeks to recover $518.60 alleged to be a balance due under the contract; $53 for feeding and caring for the sheep one day after April 1, 1920; $359.65 for feed and care for the cattle from April 15 to April 29, 1920; $25.80 for freight paid for the use of the defendant; and $192.90 for feed furnished to the bucks. In his complaint plaintiff set forth the terms of the contract, alleged that he received from the defendant 1,027 ewe sheep, 25 bucks, and 170 head of cattle; that in all respects he complied with the contract; and that he was ready, able and willing to redeliver the stock to defendant in first-class condition. He admitted the receipt of $5,500 in cash and that he was chargeable with $245.35 additional for certain pelts, hides, a heifer, a calf and some hay.

In his answer defendant denied that plaintiff had performed the contract according to its terms, and alleged specifically that plaintiff wrongfully failed and refused to provide sufficient pasturage or feed to keep the animals in first-class condition, and wrongfully permitted them "to starve, famish, and become weak and emaciated and gaunt for lack of food." Defendant admitted the claim for $192.90 and denied all the other allegations of the complaint. In seven counterclaims defendant demanded compensation as follows: For damages to the livestock by reason of plaintiff's failure properly to care for or feed the animals; for the value of fourteen sheep killed through the negligence of the plaintiff; for hides and pelts not delivered; for hay furnished to the plaintiff at Helena; for one calf and one heifer sold to plaintiff, and for expenses incurred in rounding up the cattle after plaintiff had permitted them to stray from the Spur ranch. Issues were joined by reply.

The trial of the cause resulted in a verdict in favor of the plaintiff for $544.18. A new trial was denied, and defendant appealed from the judgment. The principal contention made, and the only one we deem it necessary to consider, arises over the theory upon which the case was tried, and that theory is illustrated by the testimony introduced by plaintiff touching the condition of the stock at the time of redelivery and by instruction 9 given by the court at the instance of the plaintiff.

Plaintiff admits that sixty-five ewes, two bucks and nine head of cattle died during the time the animals were in his possession. He testified that the winter of 1919–20 was a very hard winter to keep stock; that it commenced early and ended late; that he pastured the stock, though the grass was only fair and permitted both cattle and sheep to run to straw piles in which there was considerable alfalfa and some grain; that he did not feed hay except to animals in the hospital bands; that he had 150 tons of hay but sold fifty tons in the spring when hay was worth from $45 to $50 per ton. He testified: "I considered the cattle in first-class condition when I turned them back. * * * I mean first-class condition in comparison with other stock throughout the country at that time and that winter. At the time that I delivered that stuff to them, I considered they were just as good (as) or a little better than any other stock around there I (had) seen or any that I saw after I got home." He testified that he compared the Prescott stock with cattle belonging to Panish, Pyle, Nelson and the Poindexter-Orr Livestock Company who had cattle in the immediate neighborhood.

Frank Tourtellot, a witness for plaintiff, testified that about April 1, 1920, the Prescott cattle were in fair condition, "of course they were not good"; that they were in about the same condition as other cattle in the neighborhood, but that "all of the stock was in bad shape." Again he testified that the Prescott cattle were not in first-class condition; that all cattle were in poor condition on account of the severe win-

ter; that some of the Prescott cattle got down and had to be assisted to get up; that feed became scarce and the demand exceeded the supply; that he saw the Prescott cattle eating refuse from the barn which he had placed in irrigating ditches for dams.

J. H. Keenan, a witness for plaintiff, testified that the Prescott cattle "were in good, fair condition considering the winter and everything," and again, "They were pretty fair condition considering the rest of the cattle in the country. Of course, they were thin."

Patrick Belgard, another witness for plaintiff, testified that the Prescott cattle looked about the same as the general run of cattle in that neighborhood, but that most of the cattle were poor that winter, not in as good condition as in other winters. When asked whether the Prescott cattle were in first-class condition, he answered: "Well, they were in fair condition for the length of the time of the year. * * * They would have to be pretty well taken care of to be in first-class condition a winter like that. * * * I didn't see any first-class cattle, that you would call first-class cattle, that spring, not in this herd."

Charles Evans, a witness for plaintiff, testified that the appearance of the Prescott cattle in the spring of 1920 was fairly good, but that their condition was not so good as in the fall before; that the cattle and sheep were in as good condition as other cattle and sheep in the Beaverhead Valley, but that nine-tenths of all the stock "was in poor condition."

This evidence fairly illustrates the point in controversy. [1] Other witnesses for plaintiff testified substantially to the same effect. Instruction No. 9, given by the court, reads as follows: "You are instructed that the term 'first-class condition' is a relative term, and that in deciding whether or not the defendant's livestock were redelivered to him in first-class condition by plaintiff you must take into consideration (1) the condition of said livestock when the plaintiff received them, (2) the climatic conditions that prevailed while

said livestock were in plaintiff's charge, and (3) the condition of livestock of like character generally in the neighborhood at the time such redelivery was made." For the purpose of analysis the several conditions mentioned are numbered.

1. It is conceded by plaintiff that the Prescott cattle were in first-class condition when delivered to the Spur ranch in the fall of 1919, and there is not any substantial conflict in the evidence that they were not in as good condition when redelivered in the spring of 1920; so that if this first consideration alone was controlling, plaintiff could not recover.

2. The direction of the court to the jury to consider the climatic conditions during the winter in determining whether plaintiff had performed his contract, if standing alone without elucidation, would be confusing rather than helpful; but the court's theory is amplified by the record. Defendant requested the court to charge that the weather conditions should be considered by the jury only so far as they affected the question of the amount of feed which plaintiff was bound to provide for this stock. The request was denied; hence it appears reasonably certain that the court meant to convey to the jury the idea that if the winter was a severe one, plaintiff would not be required to redeliver the stock in as good condition as if the winter had been an open or mild one; or, stated differently: If plaintiff provided sufficient feed to bring the stock through a mild winter in first-class condition, he discharged his obligation, and the fact that the winter was an extremely severe one did not impose upon him the duty to increase the feed in proportion to the severity of the winter. If we have thus rightly interpreted the instruction, the court erred in giving it. The contract which these parties made for their own government does not admit of such a construction. The fact that it was agreed specifically that plaintiff should provide ample pasture and hay "necessary to keep said livestock in first-class condition at all times" necessarily implies that plaintiff should be prepared for any ordinary Montana winter and that the amount of feed necessary to

winter the stock in first-class condition would depend upon the severity of the weather. We need not consider the relative rights of the parties if the winter of 1919–20 had been of unprecedented severity, for though it was a hard winter it was not more severe than other winters known in that vicinity.

3. The most pronounced vice in the instruction, however, is in the concluding clause. Reduced to its simplest terms, it meant that if the Prescott stock came through the winter in as good condition as other stock of like character in the same neighborhood, plaintiff had discharged his obligation under the contract. According to approved usage, the term "first-class" means: "Of the most superior or excellent grade or kind; belonging to the head or chief or numerically precedent of several classes into which the general subject is divided." (Black's Law Dictionary.) "Occupying the highest standing in a particular classification." (Bouvier's Law Dictionary.) "Of the highest rank or best quality." (New Standard Dictionary.) "Of the best class; of the highest rank; in the first division; of the best quality." (Webster's New International Dictionary.) It is reasonably apparent that "first-class" was not used in that sense by these parties, but as a relative term, for the contract provides that plaintiff should "care for, protect, pasture, feed, water and salt all said livestock at said Spur ranch in a first-class manner and according to the rules of good husbandry." In other words, "first-class condition" was intended by the parties to this contract to mean that condition in which other livestock of like character in the same neighborhood was maintained by reasonably careful and prudent herdsmen who practiced good husbandry, and while this may have been the idea dominant in the court's mind, the instruction falls far short of expressing it. Under the instruction the jury could justify the plaintiff in his care of [2] the Prescott stock if that stock was in as good condition as other livestock of the same neighborhood, even though the owners of the other livestock were habitually careless and negligent in their management, or from sheer necessity were

forced to permit their stock to winter upon the supply of feed available even though that supply was grossly inadequate. The industry of counsel and our own research have failed to discover any adjudicated cases similar to this one, but in principle the same rule which is invoked in negligence cases is applicable here. It is quite uniformly held that an employer is not excused from the imputation of negligence merely by showing that he has exercised the same degree of care as other employers under similar circumstances, or, in other words, that he followed the general custom of the business in his neighborhood, and the reason for the rule is apparent. The other employers of the vicinity may be habitually or even criminally negligent, and the law does not permit them, by their inattention to and neglect of their duties, to establish a custom, which has the force of a rule, for their own exoneration. The employer must go further and show that the customary care which he exercised was such as was usually exercised by reasonably prudent and careful employers under like circumstances. The standard is not what men ordinarily do, but what reasonably prudent and careful men, having due regard for the rights of others, do under like circumstances. (*Kinsel* v. *North Butte Min. Co.*, 44 Mont. 445, 120 Pac. 797; *Lyon* v. *Chicago, M. & St. P. Ry. Co.*, 45 Mont. 33, 121 Pac. 886.) So likewise in this instance plaintiff could not justify his conduct by showing merely that he gave to the Prescott stock the same degree of care and attention as his neighbors gave to their own stock during the same period of time. He was required to go further and show that his neighbors' circumstances were similar to his own and that they exercised reasonable care and prudence in the management of their stock.

The theory adopted by the trial court was erroneous, and because of the error the judgment is reversed, and the cause is remanded for a new trial.

*Reversed and remanded.*

Mr. Chief Justice Callaway and Associate Justices Cooper, Galen and Stark concur.