VASBY, RESPONDENT, v. UNITED STATES GYPSUM CO. ET AL., APPELLANTS.

(No. 3,177.)

(Submitted November 26, 1912.   Decided December 5, 1912.)

[128 Pac. 606.]

*Personal Injuries — Master and Servant—Mines—Fellow-servant—Vice-principal—Contributory Negligence—Pleading—Complaint—Safe Place—Assumption of Risk—Instructions—Excessive Verdicts.*

Personal Injuries—Master and Servant—Mines—Fellow-servant—Vice-principal.
    1. A foreman in a mine who had complete charge of the underground work and had authority to hire men whenever he needed them was a vice-principal and not a fellow-servant of plaintiff, a miner, who was injured by a fall of rock from the roof of the mine.

Same—Contributory Negligence—Pleading—Complaint.
    2. Contributory negligence is a matter of defense, and absence of it need not be alleged by plaintiff in a personal injury action.

Same—"Completed" Place—Instructions—Proper Refusal.
    3. Evidence *held* to show that the place where plaintiff was injured, while shoveling out material shot down the evening before, was completed, and not a constantly changing one by reason of the work being done by plaintiff and his fellow-workmen, and that therefore instructions dealing with the duty of the master toward his servant relative to furnishing the latter with a safe place to work where the place is constantly being changed were properly refused.

Same—Offered Instructions—Proper Refusal.

4.   There is no error in the refusal of offered instructions sufficiently covered by those given.

Same—Assumption of Risk—Proper Instruction.

5.   An instruction that to warrant a finding that plaintiff assumed the risks of his employment it was not necessary that he must have had absolute knowledge of them, if they were such that an ordinarily prudent man of plaintiff's knowledge and experience under like circumstances could by reasonable diligence have discovered them, *held,* to have been properly given.

Same—Lessening of Damages—Duty of Plaintiff—Instructions—Presumptions.

6.   Nothing appearing in the record to the contrary, the presumption is that the jury considered and followed the court's instruction to the effect that in a personal injury case it is the duty of the injured party to use every reasonable effort to prevent the extension of his damages, by endeavoring to obtain employment after recovery from his injuries, *etc.*

Same—Excessive Verdicts.

7.   Plaintiff's injuries consisted in a fracture of the left thigh bone and a hole in his head; he was confined to his bed for about three months, and suffered much pain; while the fracture was healing the knee-joint became stiff, and to bring back motion it was necessary to place him under anesthetics because of the severe pain attending the operation, *etc.*   *Held,* that a verdict for $10,500 was not excessive.

*Appeal from District Court, Cascade County; J. B. Leslie, Judge.*

ACTION by Lars Vasby against the United States Gypsum Company and Chas. Okerman, its foreman, to recover damages sustained by plaintiff in the course of his employment.   Plaintiff had judgment for $10,500, and defendants appeal from it and an order denying them a new trial.   Affirmed.

*Messrs. H. G. & S. H. McIntire,* for Appellants, submitted a brief; *Mr. S. H. McIntire* argued the cause orally.

This action is based upon the allegation that the defendant, Charles Okerman, ordered the plaintiff to work in a dangerous place in the mine, where the plaintiff was hurt.   Okerman was a fellow-servant of the plaintiff.   (*Goodwell* v. *Montana C. Ry. Co.,* 18 Mont. 293, 45 Pac. 210; *Thurman* v. *Pittsburg etc. Co.,* 41 Mont. 141, 108 Pac. 591.)   There is no liability on the defendants, then, unless it be by virtue of Revised Codes, section 5248. This court has held that to bring an action under the statute,

the allegation of the complaint must bring the case within the terms of the statute. (*Kelly* v. *Northern P. R. R. Co.,* 35 Mont. 243, 88 Pac. 1009; *Thurman* v. *Mining Co., supra.*) One of the necessary conditions named in the statute is that the plaintiff is himself without contributory negligence, and this should have been pleaded. This was not done. Contributory negligence must be specially pleaded, and so, *e converso,* must want of contributory negligence. (*Birsch* v. *Citizens' El. Co.,* 36 Mont. 574. 93 Pac. 941; *Kennon* v. *Gilmer,* 5 Mont. 260, 51 Am. Rep. 37, 5 Pac. 847; 14 Current Law, p. 775.)

There was not any proof of actionable negligence on the part of the defendants, or either of them. The plaintiff's injury was purely an accident, one of the ordinary incidents of mining, which the plaintiff assumed. The defendant master was not an insurer of the safety of the place where the plaintiff was at work, and the mere accident without proof of negligence on the part of the defendants was not sufficient to entitle the plaintiff to recover.

The evidence showed that the place where the plaintiff was working was constantly changing by reason of the work there done, and the rule stated by this court in the case of *Thurman* v. *Pittsburg & Montana C. Co., supra,* and *Friel* v. *Mining Co.,* 34 Mont. 54, 85 Pac. 734, in this regard is applicable.

The verdict is contrary to law. The jury disregarded the court's instruction No. 18, in which the court advised the jury that it was the duty of the plaintiff not to remain idle after his injury, but to use every reasonable effort to obtain employment. On cross-examination, the plaintiff said that he had not tried to get any work after the accident, something over a year, except that he had worked for about a month for his board and lodging in a restaurant at Riceville. The evidence showed that he was not disabled from doing every kind of work. One injured by another's negligence must use ordinary diligence to prevent unnecessary injury. (*Tiggerman* v. *City of Butte,* 44 Mont. 138, 119 Pac. 477.)

The verdict was excessive, and appears to have been given because of passion and prejudice. It has been well said by this

court several times that the question of excessive damages must be decided in the light of the evidence in each case. Other cases are not of great value as precedents, unless the facts are similar. We have failed to find a case which upheld a verdict for such a large amount as this for such injury as the plaintiff suffered. In awarding damages for personal injury, the best criterion is the average amount awarded for injuries of a like nature and extent; and where the verdict largely exceeds this average, it is excessive. (*Lockwood* v. *Railway Co.,* 15 Daly (N. Y.), 374.)

We cite a few cases of fractures of legs and arms and the awards deemed excessive: Three thousand dollars for a broken leg (*City of South Omaha* v. *Fennell,* 4 Neb. (Unof.) 427, 94 N. W. 632); $5,000 for a broken arm, reduced to $3,000 (*Pullen* v. *City of Butte,* 45 Mont. 46, 121 Pac. 878); $5,000 for a broken wrist, reduced to $3,000 (*Cordrey* v. *Stevedore Co.,* 65 Wash. 381, 118 Pac. 324); $6,375 for a broken ankle, reduced to $4,000 (*Smith* v. *Lumber Co.,* 55 Wash. 357, 104 Pac. 651); $6,750 for a broken hip held excessive, reduced to $5,000 (*Mueller* v. *Power Co.,* 56 Wash. 556, 106 Pac. 476); $5,000 for both thigh bones broken, reduced to $3,500 (*Hart* v. *Timber Co.,* 39 Wash. 279, 81 Pac. 738); $4,000 for a broken leg, reduced to $2,500 (*Lombard* v. *Railway Co.,* 47 Iowa, 494); $4,000 for a broken leg (*Railway Co.* v. *Ware,* 84 Ky. 267, 1 S. W. 493); $4,100 for broken legs (*Slette* v. *Ry. Co.,* 53 Minn. 341, 55 N. W. 137). The following verdicts have been held not excessive: Seven thousand five hundred dollars for a broken leg (*Osterholm* v. *Mining Co.,* 40 Mont. 508, 107 Pac. 499); $5,000 for a broken leg (*Hoseth* v. *Milling Co.,* 55 Wash. 416, 104 Pac. 612); $2,500 for a broken leg (*Newport News etc. Railway Co. & El. Co.* v. *Bradford,* 100 Va. 231, 40 S. E. 900); $4,495 for a broken leg (*Martin* v. *Hill,* 66 Wash. 436, 119 Pac. 849); $4,000 for a broken leg (*Roche* v. *Redding,* 125 Cal. 174, 57 Pac. 890); $4,000 for both legs broken (*Railway Co.* v. *Hastings,* 79 Kan. 499, 100 Pac. 68); $2,500 for a broken knee-cap held not excessive (*Power* v. *City,* 191 Fed. 647). The average recovery in the above-cited cases is $4,139.

*Messrs. Freeman & Thelen,* and *Mr. A. P. McAnnelly,* for Respondent, submitted a brief; *Mr. J. W. Freeman* argued the cause orally.

That the allegations of the complaint are sufficient, see *Carter* v. *Baldwin,* 107 Mo. App. 217, 81 S. W. 203, which is a case practically on all-fours with the case at bar, both as to the pleadings and the evidence. (*Southern Ind. Ry. Co.* v. *Moore* (Ind. App.), 71 N. E. 516; White's Personal Injuries in Mines, sec. 54.) Contributory negligence and assumption of risk must be pleaded as defenses, and need not be negatived in plaintiff's complaint. (*Ball* v. *Gussenhoven,* 29 Mont. 321, 74 Pac. 871; White's Personal Injuries in Mines, sec. 49.)

In this suit it is presumed that the plaintiff exercised ordinary care. (Rev. Codes, sec. 7962, subd. 4.) Vasby was not required to make a test of the roof to ascertain whether it was loose and likely to fall. (*Schroder* v. *Montana Iron Works,* 38 Mont. 475, 100 Pac. 619; *Thurman* v. *Pittsburg & Mont. C. Co.,* 41 Mont. 141, 108 Pac. 585.) The room was completed where he went to work. The obligation to take precautions to see that it was reasonably safe when Vasby went into the room was upon the defendants. (*Allen* v. *Bear Creek Coal Co.,* 43 Mont. 269, 115 Pac. 676.) The cases of *Kelley* v. *Fourth of July Min. Co.,* 16 Mont. 484, 41 Pac. 273, and the *Union Pacific Ry. Co.* v. *Jarvi,* 53 Fed. 65, 3 C. C. A. 433, lay down the rule that after a place in a mine has been completed, it is the duty of the master to use ordinary care to keep it safe; and under the application of the general rule he must perform the duty of inspection and repair, from time to time, to preserve that condition; and he is liable for any injury suffered by his servants through any negligence of duty in that behalf. These cases are particularly applicable to the case under consideration.

An injury that could have been foreseen and reasonably anticipated as the natural result of an act of negligence is actionable; or, in other words, an injury that is the natural and probable consequence of an act of negligence is actionable. (*Railway Co.* v. *Elliott,* 55 Fed. 949, 5 C. C. A. 347, 20 L. R. A. 582; *Railway Co.* v. *Kellogg,* 94 U. S. 469, 24 L. Ed. 256.) Vasby had

the right to rely upon the assurances of the defendant foreman that there was no danger in going to work in the old tunnel. (*Rogers* v. *Chicago Great Western Ry. Co.,* 65 Minn. 308, 67 N. W. 1003; *Harworth* v. *Mineral Belt Telephone Co.,* 105 Mo. App. 161, 79 S. W. 727; *Floettl* v. *Third Ave. Ry. Co.,* 10 App. Div., 308, 41 N. Y. Supp. 792; *Harder etc. Coal Mine Co.* v. *Schmidt,* 104 Fed. 282, 43 C. C. A. 532.)

It is not sufficient in a personal injury suit, to warrant judicial interference with the verdict, that the court's opinion differs from that of the jury (*Berry* v. *Lake Erie Ry. Co.,* 72 Fed. 488; *Aldrich* v. *Palmer,* 24 Cal. 517; *Lee* v. *Railway Co.,* 101 Cal. 118, 35 Pac. 572; *Howland* v. *Railway Co.,* 110 Cal. 523, 42 Pac. 983); or that, in the opinion of the court, the jury dispensed damages with a liberal hand. (*Karasich* v. *Hasbrouck,* 28 Wis. 569.) The courts have a right to take into consideration, in passing upon the amount of damages, the difference in the present and past value of money, also, as affected by the newer and older parts of the country. (Watson's Personal Injuries, sec. 362.) A judgment of $25,000 for the loss of a leg by a boy three years old was upheld in the case of *Ehrman* v. *Brooklyn City Ry. Co.,* 60 Hun, 580, 14 N. Y. Supp. 336, affirmed in 131 N. Y. 576, 30 N. E. 67. Decisions of courts of last resort show numerous judgments for $15,000, resulting from the loss of one leg, which have been affirmed.. (*Oglesby* v. *Missouri Pac. Ry. Co.,* 150 Mo. 137, 37 S. W. 829, 51 S. W. 758; *Chicago Ry. Co.* v. *Wilcox,* 33 Ill. App. 453; *Roth* v. *Union Depot Co.,* 13 Wash. 525, 31 L. R. A. 855, 43 Pac. 641, 44 Pac. 253; *Engler* v. *Western Union Tel. Co.,* 69 Fed. 185; *Gale* v. *New York R. Co.,* 13 Hun (N. Y.), 1.) For the loss of a foot by a farmer forty years of age, earning about $500 a year, a verdict of $9,000 was held not excessive. (*Georgia Ry. Co.* v. *Keating,* 99 Ga. 309, 25 S. E. 669.) For the loss of a foot by a laborer twenty-four years of age, in a coal mine, a verdict of $10,000 was held not to be too large. (*Bowers* v. *Union Pacific Ry. Co.,* 4 Utah, 215, 7 Pac. 251.) A verdict of $10,500, where a child three years old had a foot severed at the ankle, was held not

objectionable for excessiveness. (*Chipman* v. *Union Pacific Ry. Co.,* 12 Utah, 68, 41 Pac. 562.) In the case of *Lewis* v. *N. P. Ry. Co.,* 36 Mont. 207, 92 Pac. 469, it was held that where plaintiff had lost his left hand, a verdict of $10,000 was not excessive. In the case of *Morgan* v. *Southern Pac. Co.,* 95 Cal. 501, 30 Pac. 601, a verdict of $15,000 was sustained, although no bones were broken and there was but little external evidence of the injury, the injury complained of being confined mostly to the shoulder.

MR. JUSTICE SMITH delivered the opinion of the court.

This is an action brought to recover damages for personal injuries alleged to have been received by the plaintiff while working as a miner in a gypsum or stucco mine of the defendant company near Riceville, in Cascade county. It is alleged in the complaint that the defendant Okerman was mine foreman for the defendant company and was not a fellow-servant of plaintiff. It is also alleged that the roof of the mine, at a place known as the "old tunnel," was insufficiently timbered and was unsafe and dangerous; that plaintiff was ordered by Okerman to work in said old tunnel after the latter had negligently assured him that the place was safe; that plaintiff, who was inexperienced and unacquainted with the dangerous character of the tunnel, relied upon the assurances of the foreman and proceeded to work; that "while he was in every way complying with such orders and entirely without fault or negligence on his part," a large portion of the roof gave way, fell upon and injured him. The trial resulted in a verdict and judgment in favor of the plaintiff for $10,500. Appeals have been perfected from the judgment and also from an order denying a new trial.

There is not any allegation in the complaint that the company was negligent in constructing the tunnel or in allowing it to remain in an unsafe condition. The charge is, in effect, that the defendant foreman, Okerman, acting for the company in the discharge of its primary duty, negligently directed the plaintiff to work in a dangerous and unsafe place with the assurance that

it was safe to do so. This, therefore, is not a statutory action, but purely one to enforce the common-law liability of the defendant company.

1. It is claimed by the respondents, in their brief, that [1] Okerman was a fellow-servant of the plaintiff.

Plaintiff testified: "Okerman was foreman; had charge of the work; hired men and told the miners where to work; I was given my orders about work by Okerman, the foreman."

The witness Hyland testified: "During the time I was working there Okerman was foreman of the mine, had charge of it, telling them what to do and so on. Sometimes Mr. Miller, the superintendent, would come up there once a week; others there would be three or four weeks before he would come. No other person had anything to do with the running of the mine and the work on the inside except Mr. Okerman as I ever heard of."

Thomas Johnson, a miner, testified: "Chas. Okerman was foreman after Lindsey and he was foreman when I quit there. He was looking out for the work, keeping time, and giving orders in and around the mine. I don't know whether he hired and discharged men, but I guess he did. If he needed men he hired them, I think; Okerman gave me orders where to work in the mine."

Albert Anderson, another miner, testified: "Chas. Okerman was foreman when I went to work there and he hired me."

James Linderman, a mine blacksmith, testified: "Chas. Okerman was foreman of the mine up there. He gave directions to the men what to do on such and such a shift, changed them from mine to mine, and sometimes when I needed help he would get one of the miners to help me. He did the hiring of the men there. I don't remember seeing him discharge anybody but I know when they called for their time they went to Okerman. If I wanted any orders or directions I went to Okerman."

Okerman himself testified: "I was acting as foreman. I generally go in myself and sound the roof before the men go in there and if I didn't I had somebody else do it. It was my duty to look after things; see that things worked all right. I had full charge of the underground workings there. I had charge on

the outside only of the miners—not of the teamsters. I had charge of getting the gypsum out and putting it into the chutes. I had charge of the timberman too; he was working for me."

Chas. Miller, the superintendent, testified: "In the year 1909 Chas. Okerman was foreman of the Gypsum Company. I believe I employed him either the last part of August or the first part of September."

We think this testimony justified a conclusion that Okerman was a vice-principal, under the rule laid down in *Kelley* v. *Fourth of July Min. Co.,* 16 Mont. 484, 41 Pac. 273, *Allen* v. *Bell,* 32 Mont. 69, 79 Pac. 582, *Hill* v. *Nelson Coal Co.,* 40 Mont. 1, 104 Pac. 876, *Gregory* v. *Chicago, M. & St. P. Ry. Co.,* 42 Mont. 551; 113 Pac. 1123, and *Kinsel* v. *North Butte Min. Co.,* 44 Mont. 445, 120 Pac. 797. As was said in the case last cited: "His negligent act was that of the master itself."

2. The foregoing conclusion disposes of the contention that plaintiff should have alleged and proved, affirmatively, that his [2] injury was caused without contributory negligence on his part. The rule laid down in *Ball* v. *Gussenhoven,* 29 Mont. 321, 74 Pac. 871, was applicable in this case.

3. It is contended that there was not any proof of actionable negligence on the part of the defendants, but the point is not argued in the brief of appellants. However, we are of opinion that if the jury believed the testimony of the plaintiff and his witnesses, they were justified in concluding that both defendants were negligent.

4. Again, it is contended, the evidence showed that the place [3] where plaintiff was working was not a completed place, but was constantly changing by reason of the work there done, and he assumed the risk of being injured under such circumstances. The following requests for instructions were refused:

"12. The court instructs the jury that a master is not required to furnish a safe place in which to work where the danger is temporary and when it arises from the hazards and progress of the work itself, and it is known, or with ordinary prudence ought to be known, to the servant. The master is not required to be present at the working place at all times in person, or by

representative, to protect the laborer from the negligence of his fellow-workmen or from his own negligence in the constantly changing conditions of the work.

"13. While it is a general rule that a master is bound to use reasonable diligence to provide a servant with a safe place in which to work, and to maintain such condition, during the term of his employment, such rule has no application to a case where the plaintiff and his fellow-servants are creating the place of work; when it is constantly being changed in character by the labor of the men working upon it."

Plaintiff testified: "I was hired as a mucker, shoveling into a car. In the morning of December 27 I was drilling in the new tunnel. Okerman says, 'We are short of gypsum. You had better go in the other mine and help there to get out some gyp.' I asked him what it looked like in there. I hadn't been working there for several days; asked him whether that mine is safe or not. He says: 'All right; no danger; the boys is working in there now.' Then I took him at his word and went in there. I then went to work in the old tunnel at a place, I should judge, to be 200 or 250 feet from the face. By the face, I mean the place where they were working the gyp back from. There were four men in there before me, two on each side loading and two were further in throwing forth gyp to load on the car. I guess it was about thirty feet from the car that we were taking out the gyp, or thirty-five feet from the track. We were throwing it closer to the car, the small chunks and the big chunks we were rolling over. We four had been working there throwing gyp down to the car for about half an hour when the accident happened. I was knocked senseless by a rock which fell from the roof. When I went in the old tunnel that day I did not sound the sides and roof to see if they were safe. At the time of the injury the men were shooting down the roof and we had to go ahead to get the gyp down. I don't know when they shot down that gypsum we picked up the day of the accident. I don't know whether they shoot the gyp at night; I didn't see them doing that. I am sure they didn't shoot while I was in there. I don't know when they did shoot. There wasn't anybody else

working in this tunnel except us five men at the time I was hurt. There was no one else working around there at all.''

Hyland testified: ''There were no timbers in this old tunnel where we were working.   There were some further out in the tunnel.   As to whether it was timbered in a proper and safe way, I was awfully afraid of it.   The way it looked to me it wasn't fit for anybody to work in.   There was nothing.   It was all right until you got out where the gyp was shot down and then you couldn't examine it at all because the top was so high.   You couldn't get to the roof to sound it.''

Assuming this testimony to be true, and in so far as it relates to the position occupied by the plaintiff, and the method employed of ''shooting'' gypsum from the roof, it is uncontroverted, the roof was a completed place within the meaning of the rule laid down by this court in *Allen* v. *Bear Creek Coal Co.,* 43 Mont. 269, 115 Pac. 673.   Let it be noted that Vasby was not engaged in breaking down gypsum but was shoveling out what had been knocked down the evening before.   As was held in the *Allen Case, supra,* he had a right to assume that the defendants, after the gypsum was knocked down, had been reasonably diligent in inspecting the place and taking such precautions as were necessary to guard his safety.

We hold, therefore, that the court did not err in refusing to give the instructions just quoted.

5. The court refused defendants' requested instruction No. 4, which reads as follows: ''Negligent ignorance is equivalent to knowledge.   (1 Larson R. R. & P., p. 541; 4 Thompson on Negligence, sec. 4647.)   So a servant is sufficiently charged with knowledge of the conditions surrounding his place of work if he might have known of them by the exercise of that measure of [4]   care which he ought to take for his own safety under the circumstances of the particular case.''   The court, however, did give three instructions, as follows:

''9. All persons of mature years and ordinary experience and endowed with the natural faculties must be held to understand the ordinary laws of nature, such, for instance, as that unsecured roofs or walls of a mine will fall or cave in if not prevented, and

it must be presumed when such persons have knowledge of obvious defects in places in which they are engaged in performing ordinary labor, they will also comprehend the natural and probable results which will follow from working in such a place.

"10. If a servant, before he enters the service, knows, or if he afterward discovers, or if, by the exercise of ordinary observation in his department of service, having regard to his age and experience, he can discover that the place where he is at work is unsafe or unfit in any particular, and if, notwithstanding such knowledge or means of knowledge, he voluntarily enters into or continues in the employment without objection or complaint, he is deemed to assume the risk of the danger thus known or discoverable, and to waive any claim for damages against the master in case it shall result in injury to him.

"11. To warrant a finding that a servant assumed the risks of [5] his employment, he need not have had absolute knowledge of the risks, if they are such that an ordinarily prudent man of plaintiff's knowledge and experience under like circumstances could by reasonable diligence have discovered them."

We think these instructions sufficiently covered the point sought to be brought to the attention of the jury by the instruction which was refused. We find no infirmity in the court's instruction No. 11 and think it was justified by the evidence.

6. It is contended that the verdict is contrary to law, for the reason that the jury disregarded the court's instruction No. 18, [6] which reads as follows: "The court instructs the jury that, in cases like this one, it is the duty of the injured party to use reasonable effort to prevent the extension of his damages. So that if the jury should find from the evidence that the plaintiff was injured in the mine of the defendant company as alleged in the complaint, and should further so find that the plaintiff recovered from his said injuries sufficient to work after such recovery, it was the duty of the plaintiff not to remain idle, but to use every reasonable effort to obtain employment, and the jury should deduct from any alleged damage by reason of loss of employment such sums as the plaintiff earned in any other employment, and also any further sums as in the judgment of

the jury he might have earned by reasonable industry and diligence.'' The answer to this contention is that there is not anything in the record to justify the conclusion that this instruction was disregarded. The presumption is that it was considered and followed by the jury.

7. Finally, it is urged that the verdict is excessive. Plaintiff testified concerning his injuries: ''My leg was awful bad smashed [7] up. It was broken here pretty close to the knee and the knee was badly bruised up. My leg was all full of blood blisters besides being broken, and I had a hole in my head, too, where the rock hit me and knocked me senseless. It cut me open around the top of the head. It was bleeding pretty much and knocked me completely senseless. I was taken to Belt, where I was from the 27th of December until June, when I went down to Wisconsin. I was in bed eight weeks and three days, then I walked around on crutches. I was compelled to use crutches for about three months after that time and since then I have used a cane all the time. I tried to work here a while ago, but my leg was so bad I had to quit. I was trying to work just for my board too. It was hurting me so bad I went down to Belt and told Dr. Patterson how it was hurting me and showed him my knee and he advised me I had better be careful for a while. I have not since worked. My knee is not so bad when I walk on a level floor where it is not slippery. I can walk with a cane around the house but when I walk up steps or up hill then I haven't got any strength in it and it hurts awful right in the knee-joint. When I move my knee back and forth, swing my leg at the knee, it is just like the bone being knocked together. I can hear it and you can hear it when I bend it. It caused me awful much pain and causes me lots of pain now if I walk up and down steps. It hurt me awful the first two or three times. I think the druggist's bill and Dr. Patterson's bill came to $150. I could not stand working for my board. I cannot bear any weight on that knee in shoveling or anything of that kind. I can bend it only halfway.''

Dr. Patterson testified: ''I found Vasby suffering from a fracture of the left thigh bone. He was in bed for about three

months.  The outside of the limb had been very badly bruised,
so much so that the skin was knocked off and there were several
blood blisters along the side of the leg.  Of course it was ex-
tremely painful and the swelling was very great—more so than
I have seen in any case of the kind.  The union of the break in
the leg did not take place as quick as the average.  The fracture
did not extend down into the knee, so far as I know.  I never
could find any evidence that it had been fractured down into the
knee.  During the first week he suffered a great deal.  He did
not sleep well and he had to have opiates to allow him to get any
rest.  He was extremely restless.  We could hardly keep him in
the apparatus.  After the union had been formed of the frac-
ture of the leg, the knee was still very much swollen and was very
painful to use motion on.  As soon as we got the fracture strong
enough so we could work on the knee we commenced passive
motion to get the movement of the knee-joint, which was ex-
tremely stiff and could not be bent at all—very slight motion.
On account of the injury he had and the very severe inflamma-
tion of the joint and the surrounding structures, that causes
adhesions to form in and around the joint which have to be
broken up before motion can take place.  We had to put Vasby
under an anesthetic three or four times in order to get this motion
back into the joint.  Of course it was extremely painful to move
it at all but when I saw him last, before he went back east, we
got it so it would move to about a right angle.  That was quite
painful.  He was able to walk around with the aid of a stick at
that time.  When he came back he complained of the creaking
in the joint.  I examined him to-day.  There is still creaking
there.  It is a chronic condition now.  There is inflammation of
the structures of the knee-joint.  The fluid is all absorbed and
has left the lining membranes of the joint in a rough condition
and where the surfaces rub together you hear a creaking sound.
It appears to me that he hasn't a very good chance of that
getting better.  I don't think the chances are good for recovery
now.  It is pretty hard to say definitely whether he will have a
stiff knee or not.  If he keeps motion up there he will probably
continue to have as good motion as he has now.  There is always

a possibility of tuberculosis setting in there.   Tuberculosis is always more apt to affect a knee-joint that has been weakened that way.   There is considerable tenderness around the joint now.   I suppose there is a certain amount of discomfort about it all the time. As long as the knee is kept quiet he probably would not suffer much pain.''

While the verdict is large we are unable to say, as a matter of law, that it is excessive.

The judgment and order are affirmed.

*Affirmed.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.

